## THE DEVONIAN.

(District Court, D. Massachusetts. January 31, 1907.)

### No. 1,758.

1. SALVAGE—RESCUE OF STRANDED STEAMSHIP—AMOUNT OF COMPENSATION.

The British steamship Devonian, 470 feet long, and valued with her cargo at $800,000, on a voyage from Liverpool to Boston, in February, was driven from her course by a northeast snowstorm and stranded at Scituate 1,500 feet from shore, at 1 a. m., when the tide was half flood. At high tide she made an unsuccessful effort to get off and afterward pumped out some of her water-ballast tanks, lessening her draft forward 2½ feet. The beach was fairly smooth sand, and at high tide she was not aground for more than half her length, but at low tide she rested on the bottom through her full length, and received a considerable injury from the buckling of her plates and floors, although not sufficient to require her to dock until her return to Liverpool. The following afternoon the tug Patience, from New Jersey, worth about $55,000, left Boston for the purpose of offering, and, arriving at about high tide, offered, her services to the steamship, which were accepted, and, the Patience having made fast a hawser to the stern of the steamship by the efforts of both vessels, she was pulled off and proceeded to Boston by her own steam, without further injury to herself or cargo. The actual time of pulling did not exceed 15 minutes, and the tug was absent from Boston five hours, and, while in some, was in no great or unusual, danger. While the sea was rough the wind changed to northwest soon after the stranding, and the steamship was not in serious danger of injury, except from resting on the bottom, and there were other vessels at hand which would undoubtedly have rescued her on the same high tide. Whether she could have released herself without assistance as she claimed was in doubt. *Held*, that the service rendered by the tug was clearly a salvage service and entitled to be compensated as such, and that a fair award therefor under all the facts was $4,500, of which $3,300 should go to the owner, and $1,200 to the master and crew.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Salvage, §§ 72, 73, 97.

Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.]

2. SAME—ACCEPTANCE OF SERVICE UNDER MISTAKE OF FACT.

The fact that the master of a stranded vessel accepted salvage service from a tug, under the mistaken belief that it was one owned by a com-

pany whose boats his owner's agents usually employed, does not lessen the amount of salvage award to which the tug is entitled, where she was guilty of no fraud.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Salvage, § 28.]

In Admiralty. Suit for salvage.

Carpenter, Park & Symmers, for libelants.

Frederic Cunningham, for claimant.

DODGE, District Judge. The British steamship Devonian, bound from Liverpool for Boston, encountered, as she approached the coast of Massachusetts, a northeast snowstorm with heavy wind and high sea, in which she was carried out of her proper course for Boston, after passing Highland Light, so far as to run aground on the Scituate shore. This happened at about 1 o'clock in the morning of Thursday, February 15, 1906; the tide being about half flood when the steamship first took the ground. Efforts made to get her afloat during the next high water by working her engines astern proved unavailing. At daylight, the tide having ebbed, she was hard and fast aground, with no prospect of relief before the high water of that afternoon, to occur not earlier than 3:50 p. m. By agreement of parties made for the purposes of this case, the Devonian, the cargo then on board her, and the freight thereon pending, were together of the total value of $800,000. Steamship and cargo on board are both claimed and both represented in this case by the owners of the steamship. They have not been separately valued, nor is any distinction to be made between them, so far as appears from the evidence, for any purpose involved in the case.

This libel for salvage is filed by the owner of the steamtug Patience, of Hackensack, N. J., on his own behalf, and also on behalf of the master, officers and crew of the tug. This tug happened to arrive in the port of Boston, from Salem, with a barge in tow, at about 1 o'clock p. m. on February 15, 1906; the Devonian having then been aground some 12 hours. The master of the Patience went ashore in Boston, and was soon afterward informed that the Devonian was stranded at Scituate beach. Whereupon he at once returned on board his tug and started with her for Scituate as soon as possible. He reached the Devonian where she lay aground, soon after 3 o'clock p. m.

During the day, and before the tugboat arrived, everything had been made ready on board the Devonian for another effort to get afloat as soon as the tide should have arisen enough for the purpose. Some of her water-ballast tanks had been pumped out in order to reduce her draft forward. Soon after daylight the crews of the United States Life Saving Stations at Third Cliff and Fourth Cliff had visited her, each crew in a lifeboat, and by one of their number the master had sent ashore a written message to his agents to be telegraphed to Boston. Independently of this message, the Boston Tow Boat Company, accustomed for several years to furnish towage as required to vessels of the Leyland Line, to which the Devonian belonged, had received news of her stranding, from Scituate, and had despatched three of its most powerful tugs to her assistance. These tugs had started from Boston before the Patience started, but, being superior to any of them in point

of speed, she had passed them on the way down, and had so far outstripped them that when she arrived at the Devonian they were still some three miles away.

The Devonian lay nearly head on to the shore, whose general direction there is about north and south. She lay nearly opposite, or a little south, of the southerly end of Third Cliff. Her bow was probably not less than 1,500 feet from the shore. Her length is 570 feet over all. She was drawing, when she grounded, about 23 feet 6 inches forward, 23 feet 9 inches aft. By the emptying of her ballast tanks her draft forward had been lessened some $2\frac{1}{2}$ feet. Her draft aft had been increased some 6 inches. At her stern the depth of water was 5 fathoms at high water, at her bow it was nearly, if not quite, sufficient to float her, after her draft forward had been lessened, as stated. The water surrounding her was for a considerable distance to the northward and to the southward of where she lay, of approximately uniform depth at like distances from the shore, and free from ledges, rocks, or obstructions which would endanger the approach of tugs like the Patience.

The Patience was drawing about 15 feet. She ran in toward the Devonian's stern, sounding as she went. Her master, using a megaphone, hailed the steamship and asked if assistance was wanted. Understanding the reply to be in the affirmative, he turned the Patience around and backed toward the Devonian's stern, until near enough to throw a heaving line on board. This was hauled in, and by means of it a $9\frac{1}{2}$-inch hawser 225 fathoms long, was taken on board by the Devonian's people and made fast. "All fast, go ahead," was then heard from on board the Devonian, also a direction to the tug to pull direct off from the starboard quarter, off shore. There is some conflict regarding what was said at the time this direction was given. Thereupon the Patience steamed ahead in what was understood to be the direction indicated. The hawser became taut, she continued to steam ahead during an interval of time whose length is in dispute, and the Devonian, working her own engines astern, moved astern and came afloat. After she was afloat and had backed a sufficient distance off shore, the Patience still pulling on the hawser, she turned around, swinging her bow to the southward, and, when she had turned enough to head away from the shore, she cut the Patience's hawser adrift and at once proceeded toward Boston. After getting her hawser, or what remained of it, on board, the Patience returned to Boston, where she arrived at about half past 6 o'clock on the same afternoon, having been absent from Boston in all about five hours.

Such were, in their general outline, the services rendered by the Patience to the steamship. The answer denies that they were salvage services of high merit, but admits that the libelant is entitled to just and meet compensation for them, whether salvage or not; and it offers to pay such compensation, asking that it may be fixed by the court. It admits that the Patience's hawser was made fast to the Devonian, and that the Patience was pulling on the steamship when she came off the beach. It alleges that the hawser had no "sooner become fairly taut" than the steamship moved at once astern "with her own power and assisted by the tug."

150 F.—53

What is admitted by the answer in regard to the services rendered by the tug is entirely sufficient to prevent any doubt that they must be regarded as salvage services. Under circumstances such as are admitted, the contract implied from the acceptance of the tug's services could not be held to be an ordinary towage contract. Had her services not been successful, it is evident that no claim for compensation could have been maintained. It is not denied that they were, at least in some degree, successful. The stranded steamship did get afloat, assisted by the tug. The compensation for the tug's services must therefore be such as to include bounty or reward, in addition to pay for the time and labor expended.

· In applying to the facts of this case the various considerations which govern the determination of the proper amount of a salvage award, I have come to the following conclusions:

1. The large value of the property saved, fixed at $800,000 by agreement as above, I regard as the feature of the case which tends more strongly than any other to enhance the amount of compensation. While it is well understood that salvage compensation is by no means to be increased in direct proportion as the amount saved is larger, a large value saved is still always a factor of importance. The St. Paul, 86 Fed. 340, 342, 30 C. C. A. 70. For reasons, however, which will below appear, I am obliged to regard this case as one in which, as in Baker v. Hemenway, 2 Low. 501, Fed. Cas. No. 770, "a very large value was saved, but under circumstances which do not contain other elements which should require the quantum to be large." I do not, however, take the amount awarded in the case referred to as a standard by which to fix the amount of this award. It is obvious that the award here must be on a somewhat more liberal basis. The services there rendered were performed wholly within Boston Harbor, where the salving vessels belonged, there was no bad weather to be encountered, and the time occupied was only about one hour.

2. The degree of danger from which the property was saved is a question upon which the parties are most at variance. According to the libel, the steamship was hard and fast aground, and unable by any means at her command to extricate herself from her perilous position. But for the services rendered, both steamship and cargo would have suffered great loss and damage. She "was on a dangerous lee shore and upon a foul bottom, and at that season of the year there was every danger of her pounding to pieces." According to the answer, she was very lightly aground at high water—she lay comfortably on a smooth sand and mud beach without pounding or damage—a very small amount of assistance was needed, if any, to get her afloat at high tide, and there were a number of craft at hand which would have supplied such assistance if the Patience had never been there at all. ·

I have no doubt that the place where the Devonian was stranded is as exposed, and in that respect as dangerous, as any to be found on the shores of Massachusetts Bay. It is unsheltered against wind and sea from the northward and eastward, and at the time of stranding there was a heavy northeast wind blowing and a heavy sea from the same direction breaking upon the shore. The season of the year was that at

which similar weather is most to be expected. Thus far the libelants' claim of imminent peril to the property saved is supported.

The wind, however, began to shift toward N. and N. W. almost immediately after the stranding. It was N. W. at 8 a. m., and, although still heavy, its force from that direction would tend to reduce rather than increase the force of the sea. It does not appear that any material damage was sustained by the steamship from the mere violence of the seas which broke upon her as she lay aground. From damage of that character her great size and strong construction appear to have saved her. For the same reasons also she "lay easy" at all times when aground, so far as pounding or working upon the bottom were concerned. She was thus comparatively safe from some of the dangers which ordinarily threaten a vessel stranded on an exposed shore.

It is true also that the bottom upon which the ship lay was for the most part hard sand, fairly smooth and even in slope, and that she did not rest at any point upon a reef or ledge. Moreover, at high water she was aground only from her bridge forward, and not very firmly aground even for that portion of her length, as was proved to be the case when she came off. But, however favorable the situation in these respects, the fact remains that at low water the steamship had to rest on her bottom throughout her entire length of 570 feet, and that no fully loaded steamship of such size can be subjected to the strain necessarily involved in thus lying aground without imminent risk of very serious damage, if not of damage amounting to total loss. The strain upon such a vessel, even under the most favorable circumstances, as in a dry dock where carefully adjusted and distributed support is provided for her hull, and upon which she would ordinarily be placed only after discharge of her cargo, is of a kind which she is not well calculated to resist. The precise results of such a strain as that to which the Devonian was subjected, even if continued for one low tide only, may be incapable of estimation in advance, but some structural damage would be almost certain. With each repetition of the strain after the structure had once yielded in any degree, the probability of such damage would be much increased.

As has been stated, the Devonian lay aground through one low tide only. No such damage was apparent after she was floated as to oblige her to dock at Boston or to prevent her from discharging her cargo and returning to Liverpool without repairing. The first opportunity of knowing by actual observation what injury, if any, had been sustained, was after her discharge at Liverpool; when, in the latter part of March, 1906, she was dry-docked for examination and repair. The extent and nature of the damage then revealed were such as to leave no doubt that it must have been mainly due to the vessel's experience at Scituate. Whether its principal cause was the original striking when the steamship first ran aground, or her subsequent grounding at low water, it was such in my opinion as to warrant the conclusion that very great risk of further and still more serious injury would have been incurred by permitting her in that condition again to settle for her whole length on bottom, during another low tide. The damage discovered at Liverpool, briefly stated, was: Plates on both sides buckled

between frames to the number of about 60 in all, a leak developed under the engine room, floors and frames in seven out of nine ballast tanks buckled, and the stern frame cracked. In view of injuries thus extensive already sustained, I am obliged to regard the danger to the Devonian's structure and machinery involved in a second grounding as very serious, and as the principal danger from which she was relieved. Except for that danger, I do not see why she might not have remained where she lay in substantial safety during any time which I can suppose reasonably necessary for the purpose of getting her off. The danger referred to threatened the possibility of getting her off at all, still more the possibility of getting her off with her entire cargo on board and uninjured, as was the actual result.

But, although the Patience was in fact the only vessel which actually assisted in getting the steamship off, and in thereby rescuing her from that danger which I have considered the principal danger to which she was exposed, it can by no means be said that but for the Patience the Devonian would not have come off on the high water of that same afternoon. On the contrary, it is as certain as anything of the kind can be that she would have come off on that same high water had the Patience never gone to Scituate at all. I cannot doubt that the three tugs sent by the Boston Towboat Company would have done equally well all that the Patience did, and would have done it soon enough to avoid losing the opportunity of the same high tide. The necessity of making the attempt which they had been sent to make, during the high water of that afternoon was understood by every one in charge and control of those tugs, they had timed their arrival at the place accordingly, and they did arrive early enough for the purpose. They had been sent to work on the steamship together, and were accustomed to carry on such operations together. In the total power, appliances, and skill which together they were ready to bring to bear upon the task of floating the steamship they were superior to the Patience. To accomplish this task no very great amount of assistance from any source was in fact required, once the right time for making the effort had come; and this is true even if the libelants' testimony regarding the time spent and the force expended by the Patience in pulling be accepted as against that given on behalf of the steamship. All the assistance that was needed; conceding all the libelants' claims upon this point, the towboat company's boats could and would have afforded.

Nor were these tugboats the only other available sources of relief which must be taken into account. The United States Revenue Steamer Gresham, of about 1,000 tons burden, 205 feet long, having engines of about 2,500 horse power, a seaworthy and powerful vessel, drawing less water than the Patience, had been the first vessel of any kind to go to the Devonian's assistance. She had been at anchor close by, since about 1 o'clock that afternoon, waiting for the tide to rise sufficiently to warrant an attempt by her to pull the steamship off. She had already tried to throw a line on board by means of her Lyle gun, in order that a hawser might be passed from one vessel to the other. This effort had miscarried, and was about to be repeated when the Patience arrived. The regulations of the revenue service forbid its vessels to tow private craft when there is other and sufficient assistance

at hand, although it is part of their duty to assist vessels in distress in the absence of such other assistance. Nothing was done therefore by the Gresham after the Patience arrived, except to offer that tug any assistance she could render in getting the steamship off; to which offer no reply was heard on board the Gresham. If neither the Patience nor the Boston tugboats had appeared, and if the Gresham had been left to render alone all the assistance that was rendered, there is every reason to believe that the steamship would have come off, and upon the same high tide. Without the occurrence of some accident of a kind not to be foreseen, the evidence affords no reason to doubt that such would have been the result. The Gresham was much superior in size and power to any one of the tugs present.

Danger to the property saved is to be regarded, for the purposes of a salvage award, as less in proportion as the probability of assistance other than that rendered by the salvors is greater. The George Gilchrist, 1 Low. 234, Fed. Cas. No. 5,333; The Monticello (D. C.) 81 Fed. 211; The Boyne (D. C.) 98 Fed. 444; The Werra, 12 P. D. 52, 54. In this case there was more than a mere probability of other effectual assistance. Such other assistance, it may be said, was practically certain. It was at hand and immediately available.

3. The libel alleges that the Patience, after her hawser had been made fast on board the Devonian, "kept pulling for about three-quarters of an hour" before the steamship came off. The allegation of the answer that the steamship moved astern as soon as the hawser became fairly taut has already been quoted. Whether the amount of effort expended by the Patience at this critical moment was in fact substantial, or was on the contrary so slight as to have no effect, is, of course, a question of importance. In proportion as the effort then made by her was greater, the greater must be considered the steamship's danger of not floating at that tide, and the greater also the claim of the salvors for labor performed in rendering the services for which they are to have compensation.

The statement above quoted from the libel was not supported by the libelants' own evidence at the trial. No witness from the tug testified, that the tug's pull upon the hawser before the steamship moved lasted as long as three-quarters of an hour. Upon the tug's evidence, the most that could be claimed is that it was about 20 minutes in all from the time the hawser was made fast until it was cut, and that not over 15 minutes out of that time was spent in pulling before the steamship started astern. There was no actual observation on either side of the exact length of time in question. Upon the estimates of its length, on whichever side made, it is impossible to place much reliance. One witness called on the libelants' behalf, Stanley, captain of the Fourth Cliff Life Saving Station, said that "it didn't hardly seem as if (the tug) was pulling any" before she got the steamship off, and that it looked as if the steamship pulled herself off, instead of being pulled off by the tug. The respondents' evidence was to the same effect. It was given not only by persons who were on board the steamship, but by eyewitnesses who were on board the Gresham or one of the Boston tugboats. This testimony has not, however, convinced me that the pull exerted by the Patience was so short or of so little value as they regard

it. The witnesses who were not on board the steamship were all observing what took place from a considerable distance. The Patience's engineer testified that, after she began pulling on the hawser, her engines were not worked ahead at uniform full speed until the steamship came off, but that twice during that interval they were slowed down enough to slacken the hawser and started up again in order to jump or surge on it, and thus render the pull more effective. While I consider it probable that the actual duration of the pull before the steamship moved was less than 15 minutes, I think it was, nevertheless, long enough to make it impossible to say that it was of no appreciable duration or of no substantial consequence. Notwithstanding the opinions of the Devonian's officers, I cannot regard it as clearly proved that she would have come off on that tide without any outside aid whatever. Whether she would do so or not was sufficiently doubtful before the event to make her send for assistance and afterward to accept it when offered first by the Gresham afterward by the Patience. That the Patience and her hawser were of material service in holding up the steamship's stern after she did come off, while her engines were working astern, is conceded. The steamship's propeller was right handed, and its tendency in reversing was to throw her port quarter toward the shore. The Patience by her pull off shore upon the starboard quarter counteracted this tendency as soon as the steamship floated enough to swing. This, however, on the evidence, is not all that she did. Her pull upon the hawser before the steamship got afloat I find not to have been at right angles to the steamship, as some of the witnesses claimed, but in a direction varying not much from direct astern. To prevent the stern from swinging may perhaps have been all that the master of the steamship expected that the tug would accomplish when he accepted her aid, but I do not find it proved that the master of the tug was made to understand at the time that this and nothing more was what he was expected to try to do. Whether the steamship would come off or not was then unknown, however confidently it may have been expected. I cannot doubt that the Patience pulled at first in the direction best calculated to assist the steamship in trying to back off the beach, and that she contributed materially to the success of the attempt.

4. The Patience was new in 1901, and then cost $60,000 to build. She had been employed in towing coal-loaded barges between Norfolk or Philadelphia and Boston or other northern ports. She carried a derrick forward and an extra hawser, but nothing else which could be called wrecking appliances. I assume her value with all appurtenances to have been $55,000, an approximation which seems to me near enough to her true value for the purposes of the case, in which her value does not constitute a very important element. She had on board a crew of 14 men.

In rendering the above services to the steamship she had to navigate waters other than those with which her regular employment made her familiar, to approach a dangerous shore, and to come closer to a stranded steamship than she would have done had she consulted her own safety alone; and to do this in stormy and rough weather. There is therefore a sense in which she may be said to have incurred danger. Yet that danger can hardly have been greater than was frequently en-

countered as part of her regular employment. It does not appear that any higher degree of skill was involved in rendering these services than would often be required on the part of her officers and crew in performing their regular duties on board. She was undoubtedly in the hands of an experienced and wholly competent master and crew. Under their management the risk incurred by her or by them cannot be regarded as an element of great importance in fixing the amount to be awarded. The promptitude and energy with which the services were rendered were, as has appeared from the facts stated, all that was possible under the circumstances. It does not appear that the Patience herself sustained any injury, but her hawser, which cost $525 when new, and was about half worn out at the time, was practically ruined by the use made of it on this occasion.

5. The Patience had the letter "T" displayed upon her smoke-stack. This, being the first letter of her owner's name, is carried upon the smokestacks of all his tugboats as a distinguishing mark. It had been on the Patience's smokestack ever since she was built. The boats of the Boston Towboat Company also carry "T" on their smokestacks as a distinguishing mark. The master of the Devonian testified that he knew this to be the fact regarding the towboat company's boats, and that he knew also that his agents in Boston, to whom he had sent for assistance were accustomed to employ boats of the towboat company. He further testified, against the respondent's objection, that he took the Patience, when he accepted her aid as stated, to be a boat belonging to that company, and that he would not have taken her hawser had he not so believed. Assuming this evidence to be admissible, and accepting it as true, I cannot see that the amount of the award to be made ought in any way to be affected by it. It is impossible to charge the Patience with any false pretense in the matter. She bore in large letters on her stern the name of her home port besides her own name, and this was plainly displayed to the Devonian as she backed toward that vessel before the heaving line was thrown. The three boats which did belong to the towboat company were then approaching, in plain sight, and not far off. There was no necessity for being misled when the truth could have been so readily ascertained. The award to be made to the Patience is, so far as appears, the same award as would have to be made to a boat of like character belonging to the towboat company, had it been the first to arrive, and had it done the same work which the Patience did; the Patience being present with the other boats of the towboat company, but like them taking no active part.

6. Of the decisions referred to by counsel on one side or the other, The St. Paul, 86 Fed. 340, 30 C. C. A. 70, deals with the largest value at risk, and with a much larger value than was here at risk; but in their character the salvage services there rendered differed so widely from these that the case is of little value as a guide to the proper amount of this award. Baker v. Hemenway, 2 Low. 501, Fed. Cas. No. 770, already cited above; The Alamo, 75 Fed. 602, 21 C. C. A. 451; Ulster S. S. Co. v. Cape Fear Towing Co., 94 Fed. 214, 36 C. C. A. 201; and The Apache (C. C.) 124 Fed. 905—are all cases of assistance to stranded vessels and cases of exceptionally large values at risk,

though in none of them was the value so large as here. In all of them, however, except Baker v. Hemenway, either the danger to the property saved or the risk incurred by the salvors, or the time and labor expended in rendering the assistance, was greater. I have regarded the cases mentioned as of more value as precedents than any of the others cited, but none of them can be said to present more than a remote analogy to the facts upon which this award must depend.

The award to the libelant will be in all $4,500. This I regard as sufficiently liberal compensation for the services rendered, even in view of the large value of the steamship and her cargo. $3,300 of this sum is to go to the libelant, as sole owner of the Patience, as compensation for her services and the damage to her hawser. $1,200 is to go to the men on board her; $500 thereof to the master, $700 to the 13 other men on board, to be divided in proportion to the wages then being paid to each of them.