## THE SAMUEL B. HUBBARD.

### (District Court, D. Massachusetts. December 21, 1915.)

### No. 1385.

SALVAGE ⬡⟝38—DISTRIBUTION OF AWARD—SALVING OF DERELICT.

The schooner Hubbard, laden with lumber, was caught in a severe gale, and on her signals of distress the fishing schooner Mary, returning laden, went to her assistance. She was then about 50 miles east by south of Boston light. She was leaking, down by the head, and unable to carry sail. Her crew abandoned her and went on board the Mary, but some of the latter's crew, who were working on the lay, and had finished their catch, and were returning to port, went on board the Hubbard, and with considerable labor and risk got sails up. Some stayed, and the others went back. The Mary stood by until the storm abated, and then proceeded to Boston, from where the tug Sadie Ross, on being notified, went to the rescue, and after a search found the Hubbard and towed her to port; the service lasting about 22 hours and involving some risk, on account of the half sunken condition of the tow. A salvage award of 50 per cent., of salved value, amounting to about $2,700, was agreed upon. *Held*, that the tug, having been the actual means of saving the vessel, was entitled to $1,000 of the award; that the Mary, which incurred no risk and performed no actual service, was entitled to $400; that of the remainder, to be distributed among her crew, the four men who remained on the vessel and the captain of the Mary should receive $200 each, and the remainder be distributed to the other members of the crew.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 93–102; Dec. Dig. ⬡⟝38.]

In Admiralty. Suit by the Ross Towboat Company and others against the schooner Samuel B. Hubbard. On distribution of salvage award.

Blodgett, Jones, Burnham & Bingham and Sylvester M. Whalen, both of Boston, Mass., for libelants.

James R. Murphy, of Boston, Mass., for intervening petitioners.

MORTON, District Judge. The owners of the cargo have agreed that the salvage should be 50 per cent. of its value. That amount was $4,028.42, and the salvage on it is therefore $2,014.21. Counsel for the Hubbard did not desire to be heard in opposition to a similar award as to the vessel; and no sufficient reason appears why the same percentage should not be awarded against her. She sold for $1,325, and I accordingly award as salvage 50 per cent. of that amount, viz., $662.50. This makes the total salvage $2,676.71.

The contested questions relate to the apportionment of the salvage money. The facts are not seriously in dispute and are as follows:

The Hubbard, laden with lumber, was caught in a severe gale. She was sighted in distress by the crew of the fishing schooner Mary, which was inward bound with a fare of fish, at daybreak on Sunday morning October 3, 1915, about 50 miles east by south from Boston Light. She was flying distress signals. The wind was blowing a gale and a heavy sea was running. The Hubbard was leaking, and had settled until her decks were level with the water. She was down by

the head and was unable to carry sail. Her crew were worn out by
fatigue and exposure; they abandoned her, and with some difficulty
went on board the Mary in their own longboat, without any inten-
tion of returning to the Hubbard. Thereupon some of the men from
the Mary, from 10 to 14 in number, went on board the Hubbard, for
the purpose of making an effort to save her. With considerable labor,
and with danger that was by no means negligible, they cleared her
sails so that they could be hoisted, and got sail on her. The Mary
stood by during the day, ready to help, if necessary. Late in the after-
noon it was apparent that the gale was nearly over and that fine
weather was coming. The Mary thereupon took off all her men ex-
cept 4, namely, Bolan, Burns, Welch, and Troy, and proceeded to Bos-
ton on the understanding that she would send a tug to bring the Hub-
bard in. The four men named stayed on the Hubbard. The Mary
arrived in Boston early Monday morning. Her captain at once got
into communication with the owners of the tugboat Sadie Ross, in-
formed them of the circumstances and of the general location in which
he supposed the Hubbard would be found, and suggested that they
go after her on a salvage basis. At first they demurred, their hesita-
tion being chiefly due to the likelihood that some other steamer would
pick up the Hubbard before their tug could find her. The captain
of the Mary said that, if they did not care to do the work, he would
give somebody else the chance; they referred the matter to the captain
of the Sadie Ross, and he went out on his own responsibility. He left
the port of Boston about 10 a. m. Monday, and proceeded to the
vicinity where he had been informed that the Hubbard would be found.
He did not see her until about 4 o'clock in the afternoon. A heavy
sea was still running, but otherwise the weather was not bad. No
men from the Ross went on the Hubbard. By means of a heaving
line, a hawser belonging to the Ross was pulled aboard the Hubbard
and made fast by the 4 men who had stayed on her, and the Ross
towed her to Boston, where they arrived about noon the next day
(Tuesday). During the trip the hawser broke, being chafed against
the bobstay; but it was again made fast by the men on the Hubbard,
and the voyage was continued. The salvage service lasted about 22
hours. It was somewhat difficult, because the Hubbard yawed contin-
ually and could not be steered straight. It is distinctly more difficult
to tow a water-logged vessel than one which is not in that condition.
In this case there was the added danger to the tug occasioned by
the breaking of the hawser, which might have fouled the propeller
and caused injury, but did not. When the tow arrived at the Nar-
rows, the Hubbard was steering so badly that the captain of the Ross
considered it unsafe to take her through without the help of another
tug; and the E. D. Haley, belonging to the same owners, was called
into service and assisted from that point into the harbor.

The value of the Mary, with the catch which she had on board, was
about $15,000. She carried a crew of 24 men, all told. She was be-
ing sailed on a lay, and all her crew were working on shares; her
owners were not obligated to pay fixed wages to the men. The work
of fishing had been completed for that trip. The Ross also was worth

about $15,000, and carried a crew of 5 or 6 men, all told. The Haley was worth about half as much as the Ross and carried about the same number of men.

The parties who make claim against the salvage money and among whom it is to be apportioned are: (1) The owners of the Mary; (2) the crew of the Mary; (3) the 4 men who stayed on the Hubbard; (4) the owners and crew of the Sadie Ross; and (5) the owners and crew of the E. D. Haley.

The principles upon which apportionment should be made between different salvors are somewhat indefinite. To some extent they are the same as those on which the award itself is made; e. g., the value of the property used by the salvor, the peril to which the property was exposed, the loss of other business by undertaking the salvage work, and the success of the undertaking. These relate to the use of property and concern the rights of its owner. Other elements entering into the apportionment are the initiative, skill, and courage displayed by the officers and men in undertaking work which they were under no obligation to do. What peril of life or limb did they disregard? What public service did they render? What life or property did they succeed in saving? The efforts should be to give to each person interested such an amount as, if the circumstances should repeat, would lead him again to undertake the work. Other considerations also enter into the matter of apportionment, but those referred to are among the most important.

It will be convenient, first, to determine the proper division of the salvage money as between the tugs, and the owners and crew of the Mary.

As to the Haley: Considered as salvage service, that rendered by the Haley was of the lowest possible character. It involved neither enterprise, danger, nor uncertainty of reward. She was really assisting her consort, the Ross, and is entitled to no more than a liberal per hour compensation. She is awarded $30.

As to the Ross: The initiative in the enterprise was not hers; she did not find the wreck; she was sent to it after being informed as to its general location by the Mary; she was not engaged upon a voyage, or upon other lucrative employment, which she interrupted in order to undertake salvage service; nor in doing so did she depart from her usual line of work. On the contrary, she was acting within the general lines of her business and equipment. She went out with no certainty that she would be the one to bring the Hubbard to port, and with the understanding that, if she did not do so, she would get nothing; she went out knowing, too, that the work would be more difficult and somewhat more hazardous than towing usually is. The elements of enterprise and courage which are so largely recognized in the apportionment of salvage awards are less noticeable in the case of the tug than in the case of the Mary and her men. In The Carroll, 167 Fed. 112, 92 C. C. A. 564, it was said:

"It would seem that in a case of this class, where the service rendered, although a salvage service, is not in its nature different from the customary employment of the salvor, and the danger is not certain and extreme, an allowance of a lump sum bearing some relation to the cost of the service, if ren-

dered under a contract, is fairer than a percentage * * * of the salved property."

It is, however, true that the actual saving of the Hubbard was almost entirely the work of the Ross; and success is a very important element, both in the award, and in the apportionment, of salvage.

At the time when the Ross started out, there was, somewhere near Boston Light, a vessel in distress, the salvage value of which, as it now appears, was $2,676.71. What proportion of that amount should be awarded for finding that vessel and towing it in, a service lasting, as before stated, about a day? In The Annie Torrey, 2 Pritchard's Adm. Digest, p. 2005, an English court under somewhat similar circumstances awarded the towing vessel one-third of the salvage money. I think that proportion should be slightly increased in this case; and I accordingly award to the owners and crew of the tug Sadie Ross the sum of $970, making a total of $1,000, for towing service. I am not asked to apportion this sum between the owners and crew.

This leaves $1,676.71 as the amount to be divided between the owners and the crew of the Mary. As to the owners of the Mary: It was said by Judge John Lowell, in a somewhat similar case (The Lovett Peacock, 1 Low. 143, 147, Fed. Cas. No. 8,555), that "the owners appear to be entitled to the usual share of one-third;" and in Adams v. Bark Island City, 1 Clif. 210, Fed. Cas. No. 55 (s. c. 1 Black, 121, 17 L. Ed. 70), Mr. Justice Clifford, on circuit, awarded one-third of the salvage to the owners of the steamer Westernport, by which the salvage service was rendered, and two-thirds to her crew. The table of "Apportionments of Salvage Awards" in Pritchard's Adm. Digest, vol. 2, p. 2119 et seq., indicates that, as to the English practice at least, it is hardly correct to say that the "usual share" of the owners is one-third. As that table shows, awards to owners have varied from one-fourteenth, or less, to three-quarters. Generally speaking, a steamer takes more than a sailing vessel, because she is capable of rendering more effective assistance, and her service requires less exposure and exertion by her crew. Cape Fear Towing & Trans. Co. v. Pearsall, 90 Fed. 435, 33 C. C. A. 161 (C. C. A. 4th Circuit). In so far as a general statement can be formulated from the English cases, I think that, where a sailing vessel does no more than to put men on the distressed vessel, who there perform salvage service, the assisting vessel being put to no danger herself, and not performing any service, such as towing or furnishing supplies, the award to her has usually been less than one-third. In this case, moreover, the men who performed the actual work of salvage in the first instance were not under fixed pay by the owners, and the time spent by them on the salvage work cannot be regarded as the owners' time. I award $400 to the owners of the Mary.

This leaves $1,276.71 to be divided among her crew. Obviously the 4 men who boarded the Hubbard early Sunday morning and stayed on her, under conditions of much hardship and not a little danger, until she reached port on Tuesday afternoon, are entitled to special consideration. It is true that of themselves they probably never could have got the vessel into port, and that their work in navigating counted

for little or nothing. Their chief service was in keeping possession of the Hubbard, and possibly in preventing her from going ashore. When the Ross reached her, she belonged, subject to the claim of her owners, to these 4 men, who were holding her for themselves and for the owners and crew of the Mary; and they stuck to their possession until port was reached. They displayed courage and perseverance of a high order; without their efforts, it is clear that the owners and crew of the Mary would have but little claim to salvage. Moreover, a derelict, in the vicinity where the Hubbard was, would have constituted a dangerous menace to other vessels. I award these four men $200 each, and a like amount to the master of the Mary, under whose control the salvage work was entered upon, and who was in charge of it while the Mary stood by the Hubbard.

As to the others members of the crew of the Mary: Some of them, as before stated, went on board the Hubbard and assisted in clearing her rigging, and afterward returned to the Mary and came on to Boston. These men did difficult and risky work, for the seas sometimes came aboard so heavily as to move the lumber on deck where they were working. Their names were not given, and they cannot be separated from the rest of the crew. The rest of the Mary's crew did nothing in the salvage work and suffered no inconvenience therefrom, because she carried so many men that putting 4 on the Hubbard did not materially increase the work of those who remained. As to them, the most that can be said is that, if the Mary had not undertaken the salvage, her crew would have reached Boston about noon on Sunday, instead of about 6 a. m. on Monday; they are entitled to but little. The award to the crew of the Mary must rest chiefly on the work of the men who boarded the Hubbard. I award the balance of the salvage money, $276.71, among the crew of the Mary in proportion to their lays, excluding her master and the 4 men to whom awards have already been made.