## THE JASON. THE HESPEROS. THE HAMILTON.

(District Court, E. D. Virginia. April 23, 1919.)

1. COLLISION ⊛➡71(3)—ANCHORED VESSELS—IMPROPER ANCHORAGE.

A collision between the steamships Jason and Hesperos, anchored in James river off Newport News, *held* due solely to the fault of the Hesperos, which, coming later, was bound to give the other ample searoom, and did so at first, but anchored so insecurely that she dragged her anchors in a storm, and, although she drifted within a ship's length of the Jason three hours before the collision, and could have moved to a safe distance, did not, and when the wind increased was driven against the other vessel.

2. SALVAGE ⊛➡34—BEACHING SINKING STEAMSHIP—AMOUNT OF AWARD.

A tug *held* entitled to a salvage award of $15,000 for safely beaching a steamship, which was in a sinking condition from collision in a harbor at night in a storm; the service requiring some seven hours, and the value of the tug being $75,000, and of the ship and cargo $3,600,000.

In Admiralty. Suit for collision by the Jason Navigation Steamship Company against the steamship Hesperos, and suit by the tug Hamilton against the steamship Jason for salvage. Decree for both libelants.

Hughes, Vandeventer & Eggleston, of Norfolk, Va., for the Jason.

Hughes, Little & Seawell, of Norfolk, Va., for the Hesperos.

Lewis, Adler & Laws, of Philadelphia, Pa., and John W. Oast, Jr., of Norfolk, Va., for cargo owners and insurers.

Edward R. Baird, Jr., of Norfolk, Va., for the Hamilton.

WADDILL, District Judge. This case involves a collision between the steamship Jason and the steamship Hesperos, that occurred about 9:30 on the evening of June 12, 1918, in the harbor of Newport News, slightly westerly of the Warwick Machine Company pier.

The original libel was filed by the Jason Navigation Steamship Company against the Hesperos, and was twice amended, and Alexander Sprunt & Son and the American Smelting & Refining Company, and the Underwriters, the owners and insurers of the cargo filed their petitions asserting large claims against the Hesperos for loss and damage to the cargo sustained in the collision. Subsequently the steam tug Hamilton libeled the Jason to recover for salvage services rendered in connection with salving her after the collision, and by consent the testimony was taken and the combined causes heard together.

[1] The Jason, a large American steamship, 324.2 feet long, 40 feet beam, 25 feet depth, gross tonnage 2,551, on Saturday, the 8th day of June, 1918, about 3:30 p. m., came to anchor in the harbor of Newport News, and on the following Tuesday, about 8:35 a. m., the Norwegian steamship Hesperos, 389.8 long, 54.1 beam, 24.6 depth, gross tonnage 4,141, also anchored above and to the westward of the Jason. Both ships were brought in by duly licensed Virginia pilots, and in locating the Hesperos, the ship coming last to anchor, and charged with the duty of affording proper berth room to the Jason, due allowance was made of some three ship's lengths, or 1,100 to 1,200 feet.

⊛➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The collision between the ships occurred substantially under the following circumstances: On the evening of the 12th of June a storm of some proportions set in, commencing about 3 o'clock, and, as shown by the Weather Bureau report at Norfolk, the wind blew at different velocities, as follows: At 4 o'clock, 31 miles; at 5 o'clock, 27 miles; at 6 o'clock, 24 miles; at 7 o'clock, 18 miles; at 8 o'clock, 17 miles; and from 8:59 to 9:09, 18 miles; from 9:10 to 9:14, 20 miles; 9:15 to 9:27, 19 miles; 9:27 to 9:29, 44 miles; 9:29 to 9:30, 68 miles; 9:30 to 9:37, 60 miles; 9:37 to 9:38, 58 miles; 9:38 to 9:39, 48 miles; 9:39 to 9:41, 35 miles; and at 9:43, 26 miles. During the evening, between 3 and 6 o'clock, libelant charges that the Hesperos' anchor dragged from time to time, until the ships at 6:30 were within a ship's length of each other, and approximately at 9:30, on the height of the storm, they came into collision, causing serious damage and injury to the Jason and her cargo, from the effects of which she had to be promptly beached.

Many of the incidents usually in dispute in a collision of this sort, such as the location of the ships, the time of anchorage, the vessel charged with the burden of providing proper berth space, and the prevalence and intensity of the storm, are not seriously controverted here. The case turns almost entirely upon the correct determination of the fact of which of the two vessels, if either, actually dragged anchor, whether both vessels were properly anchored, and whether the accident was inevitable or not.

The Jason insists not only that the Hesperos dragged her anchor from time to time, between 3 and 6:30 o'clock on the evening in question, as well as at the time of the accident, but that she was in fault, in that she failed to have out her port as well as her starboard anchor in time to avert the collision, and especially that she was negligent in the manner of paying out her anchor chains during the evening preceding the collision; whereas, the Hesperos says that her anchor did not drag, that she had out ample chain, that the same was paid out in a seamanlike manner, that the anchor of the Jason, and not that of the Hesperos, dragged, and that the accident, so far as the Hesperos was concerned, was inevitable.

The correct solution of these issues will be conclusive of this case, assuming the accident not to have been inevitable, as claimed by the Hesperos.

I. Consideration will be first given to the anchorage and movements of the Hesperos before and at the time of the collision. On the evening of the occurrence, the master of the Hesperos and her first officer were both ashore, having been away since the preceding day. They returned to the ship about 6:30 that evening. On their return they admit seeing the Hesperos within a ship's length of the Jason, and, as they claim, in the same position in which she had been from the time of her original anchorage. They did not personally know of the dragging of the anchor, as it occurred, if at all, during their absence; but they stoutly maintain that there had been no change in the position of the ship since she first came to anchor. The Hesperos at 3 o'clock had her starboard anchor on 30 fathoms of chain, and

15 fathoms more was paid out about 4 o'clock, and a further 15 fathoms, making 60 fathoms, on the starboard anchor, and at 6:50 the port anchor was dropped on 13 fathoms of chain. On the coming of the squall, 25 fathoms additional was paid out on the starboard anchor, making a total of 85 fathoms, and 47 fathoms on the port chain, making 60 fathoms altogether.

The libelant insists that the Hesperos should have had out both anchors; that one anchor was not sufficient to protect a ship of her size, light, in the winds liable to occur at that season of the year in the harbor of Newport News, and moreover say that the paying out of the anchor chain, especially that of the port anchor, admittedly was done so unscientifically as to afford no additional and sufficient protection to hold the ship, and that before the anchor was dropped the ship should have been eased up, and the anchor chain let out gradually, instead of running the same out all at once, causing it to coil on the bottom; that the method pursued tended to break the hold of the original anchorage, and, instead of holding the ship, to bring her up with a jerk, and also to foul her port anchor.

The Hesperos, during the time she is alleged to have dragged her anchor, between 3 and 6:30 o'clock, was in charge of her second and third officers; the second officer being a young man, 26 years of age, without a mate's license.

The testimony strongly tends to support the view that the anchor chain of the Hesperos was improperly paid out. The libelant's testimony in this respect is controverted, but the weight of the evidence preponderates in favor of the libelant. It comes from navigators of large experience and of a high order of intelligence, including Capt. John G. Quimby, a prominent naval officer, who testified as follows:

"Q. Captain, assuming that the steamer Hesperos was lying in the James river, abreast of, and about off and about a quarter of a mile offshore from, the Warwick Machine Company pier, a little above the pier, on June 12, 1918, in about 20 feet of water; she was light, drawing 12.6 forward, 14 feet aft; at that time she was anchored in 20 feet of water; about 4 o'clock in the afternoon of that day those in charge of the Hesperos paid out 13 fathoms additional chain; the wind at the time was blowing somewhere between 31 and 32 miles an hour, and the tide ebbing; that chain was paid out in such a manner, she being anchored on the starboard anchor, that the vessel fell back, and came up with a jerk: Will you state whether or not in your opinion that was the proper and seamanlike manner to pay out chain. A. It was not; danger of parting the chain and breaking the anchor out of the mud; it is not the proper way to do it. * * *

"Q. Assuming that after that 13 fathoms had been dropped in the water on the port anchor, as I have described, later on during the squall, which occurred about 9:30 p. m., those in charge of the Hesperos paid out 40 additional fathoms on the starboard anchor, and simultaneously 47 additional fathoms on the port anchor, giving the starboard anchor a total of 85 fathoms, and the port anchor a total of 60 fathoms: Was there any time that port anchor had any holding power? A. There was not. Those anchors were dropped in a horizontal distance of 45 fathoms apart, and with 85 fathoms on the starboard chain, and 60 on the port chain, there was 20 fathoms somewhere of slack chain on the port chain.

"Q. So at no time, from the time the 13 fathoms was dropped in the water until the 65 was dropped on the port and 85 on the starboard, was the port chain taut; that is correct? A. Yes, sir; and 20 fathoms on the bottom coiled round the anchor."

Regardless, however, of the paying out of the anchor chain, the court is convinced that the evidence establishes the fact that between the hours of 3 and 6:30 p. m., the Hesperos did drag her anchor from her original anchorage to within a ship's length of the Jason, the vessel she was required to give proper berth room to. The officers and crew of the Jason testify to this fact, and the naval gun crew from the Hesperos, several in number, corroborate it, and it is not inconsistent with some of the testimony from the Hesperos. The master and chief officer of the latter ship say, upon returning at 6:30 p. m., that the two vessels were a ship's length apart. This strongly sustains the libelant's contention as to the ship having dragged, assuming them to have been originally anchored a distance of from 1,100 to 1,200 feet apart, as the court thinks the testimony indisputably establishes.

This presents the question of whether the burdened vessel provided and maintained a proper anchorage. If she did not, and that brought about the collision, she is liable for damages growing out of her neglect. Unquestionably, a ship's length between the two vessels was an unsafe distance originally to have allowed the vessels to be in after coming to anchor. The evidence conclusively establishes that the vessels were originally anchored at the proper distance, and on the evening of the collision that the Hesperos dragged, as claimed by the libelant, until she was within a ship's length of the Jason, and that for a period of 3 hours prior to the collision she was allowed to be and remain in this dangerous proximity to the vessel she was charged with the duty of keeping clear of, in the presence of an impending storm. During these 3 hours, ample time was afforded the Hesperos to have moved back to the place from which she had drifted, or other safe anchorage, and if her navigators chose not to do so, and to rely upon placing out the port anchor, which failed to hold the ship, upon the storm increasing in volume, as it did, 2½ hours later, she, and not the Jason, should bear the burden therefor. Had both her anchors, instead of one, been out, it is probable that the dragging between 3 and 6:30 o'clock would not have occurred, and, indeed, had one with sufficient chain been out, she would probably have ridden out the storm and the disaster been averted. The Hesperos cannot escape responsibility, having crowded the anchorage of the Jason, by merely attempting while in the position mentioned, to lengthen the anchor chain. The vessels were then in too close proximity for safety, and had been allowed so to remain for more than three hours, and hence she cannot escape liability for ineffectively attempting to strengthen the anchor chain. The burdened vessel ought to have moved away, or at least in some effective way to have guarded against disaster of the character in question, reasonably to have been anticipated.

II. The court does not concur with the view that the Jason dragged her anchor. On the contrary, the testimony is entirely clear that she did not, and that her berth was fouled by the Hesperos dragging into her.

III. The Hesperos interposed the defense of inevitable accident; that is to say, that the collision could not have been avoided by the exercise of proper prudence and care on her part, and that the same was unavoidable. This defense will not avail the Hesperos for two reasons: First, she is not in a position to interpose the same, as she was not only not free from fault, but responsible for bringing about the collision; second, the facts demonstrate that the collision could and would have been provided against by the exercise of prudence and care on the part of the navigators of the Hesperos. She was a large vessel, in an exposed, crowded harbor, light. She was warned of the danger of such a situation, and good seamanship required that she should have taken no risks in placing her anchors, or in the manner and method of paying out the same. The storm was violent, it is true, for a little while, but not seriously so for over 2 minutes. Admonition of approaching bad weather had been evident. The wind was at intervals increasing in velocity during the evening. Indications of a threatened thunder storm were apparent to experienced persons. The velocity of the wind was not especially strong for more than about 10 minutes, and very high for about a minute, and could have been reasonably anticipated, and its consequences safeguarded against by the proper handling of the vessel. The Severn (D. C.) 113 Fed. 578; The Terje Viken-Bavaria (D. C.) 212 Fed. 1020, The Bertha-Athanasios (D. C.) 244 Fed. 319.

It is true several other vessels dragged anchor about the same time; but the great body of shipping found no difficulty in procuring entire security, as would also the Hesperos, if she had been properly anchored, or exercised ordinary care and nautical skill, after her navigator's attention had been drawn to the weakness of its anchorage. Had both vessels remained in their original anchorage, there would have been no collision; and had the Hesperos placed out both anchors, on proper anchor chains, there would not have been, nor should there have been, danger, if she had discharged her duty by moving to a safe distance, after her dangerous proximity to the Jason was apparent, more than 3 hours before the disaster.

The conclusion of the court is that the Hesperos should be held solely responsible for the collision.

[2] This leaves for consideration only the question of salvage, presented by the suit filed for that purpose, and heard along with the main or collision case. The facts in connection with the claim are briefly these:

The Hamilton is a large and powerful harbor tug, 74 feet long, 17.2 feet beam, and of 200 horse power, with a crew of seven officers and men. In the early afternoon of the collision, she had been engaged in assisting coaling the Jason, and after the collision, about 10:45 p. m., in response to urgent calls for help from the Jason, which had been most seriously damaged, promptly went to her assistance. The Jason was badly broken and cut into on the port side about and below the water line, and when the Hamilton arrived she was in 52 feet of water, and taking in water rapidly, especially in her first and

second holds. She was listed slightly to starboard, and it was of the utmost importance to beach her, in order to save the ship and cargo, especially the latter, which consisted mainly of 8,750 bales of cotton, and a large quantity of saltpeter, and some steel. The Hamilton assisted in raising the anchor of the Jason, and then made fast to her starboard bow, first securing a portion of the deck cargo of cotton, so that it could not shift over and onto the tug. She then turned the bow of the ship inshore, and succeeded about 12:15 a. m. in beaching her in 14 feet of water at the Jason's bow. The ship was thus made safe, though considerable water damage had been and was sustained by the cargo. The Hamilton took two ladies, the wife and mother-in-law of the first officer, off the ship, and subsequently carried the latter ashore with a view of finding the ship's master, who wa not on board. The tug spent an hour in that effort, and then returned to the ship, stood by, and remained with her until 5:30 in the morning, when it was discharged from further service.

The tug was valued at $75,000, and was under charter hire at $3,900 per month. The Jason and her cargo were very valuable; the ship worth considerably more than $1,000,000, and the cargo at least $2,-600,000.

That the Hamilton is entitled to a salvage award cannot be seriously questioned. It is true the service was rendered in the harbor, and the claim to salvage may not be of the highest order; but libelant's rights as a salvor should be respected, and a reasonable sum allowed. The danger to the tug and its crew was probably not very great, though there was some in attempting to handle this large ship in the then weather conditions. A violent storm had shortly preceded the service, and during its rendition the wind was quite high, blowing some 24 miles an hour. There was necessarily risk in such a situation, taking into account the relative sizes of the two vessels, aside from the appreciable danger of the deck cargo breaking loose and falling upon the tug, if the ship listed further to starboard.

The value of the tug was considerable, and that of the salved property very large. The service was skillfully and successfully rendered when time was exceedingly urgent, and when no other help responded to the Jason's call, assuming it was possible to secure the same in the then disturbed condition of shipping in the harbor. The court feels, having due regard to the elements properly entering into an allowance of this character, that the sum of $15,000 would be a proper award to make, and a decree for that amount will accordingly be entered.