## THE PROFESSOR KOCH.

### (District Court, D. Massachusetts. October 27, 1919.)

### No. 1703.

SALVAGE ⟊30—AMOUNT OF AWARD SUFFICIENT.
> Where a barque stranded on a ledge during fair weather, and libelant was notified to send tugs to assist the barque, *held* that, though the towing service was performed skillfully and promptly, yet, as there was no risk of life, and a revenue cutter was ready to render assistance, an award of $10,000 for salvage, which was about four times the ordinary commercial price of the towage service, was proper, though the barque was worth $117,000 and the cargo $713,000, and it was in a dangerous position.

In Admiralty. Libel by Edwin M. Richards and others against the barque Professor Koch and cargo. Decree for libelants, which also provided for an award for intervener Barry.

Gaston, Snow, Saltonstall & Hunt and Russell, Moore & Russell, all of Boston, Mass., for libelants.

Blodgett, Jones, Burnham & Bingham and Frederick W. Eaton, all of Boston, Mass., for Jeremiah Williams & Co. and others.

Fitz-Henry Smith, Jr., Walter Shuebruk, and Wendell P. Murray, all of Boston, Mass., for Weinberg and others.

Wendell P. Murray, of Boston, Mass., for Carl Anderson.

MORTON, District Judge. This is a case of salvage. The Finnish barque Professor Koch, 236 feet long, 1,400 tons, steel construction, stranded on Cox's Ledge, near Scituate, at about 11 p. m. on April 29, 1919. The weather was fair at the time, with a moderate breeze, and not much sea. Just before the barque struck, her master had become suspicious of his surroundings and taken steps to check her headway. She struck the ledge lightly and slid into a depression on it,

which held her something like a cradle. There was no immediate danger; but it was a very bad position, exposed to the full force of the sea, if a storm should arise.

The stranding occurred near high water. After futile efforts to get the barque off by backing her sails, distress signals were displayed, and the Coast Guard came out to her. Her master requested them to send for tugs to come to his assistance. The Coast Guard accordingly notified the Boston Towboat Company, which received the message about 2 a. m. Steps were promptly taken by it to render help to the barque. Shortly after 8 o'clock the next morning two tugs belonging to the Towboat Company reached the barque and put lines to her, to steady her as the tide rose. About 9 o'clock a third tug came. The weather remained fine and the sea moderate. At high water, which occurred about noon, the tugs pulled the barque off the rock.

When she came clear, there was 4 or 5 feet of water in her hold and a bad slit in her bottom, running back about 10 feet from her forefoot. She had a collision bulkhead, which saved her from sinking; but she was down by the head and was making water at the rate of about 2 feet an hour. The problem of what to do with her after she came off had been talked over by Capt. Nickerson and Capt. Barry, both of whom were very familiar with that coast. They had decided that the best plan was to take her to Scituate harbor and get her as far up the entrance as they could. Accordingly, on clearing the rock, the barque was towed to that harbor, a distance of about a mile and a half, and grounded in the channel, at the entrance. In this position she was safe from sinking, but was unprotected from the waves and in danger of breaking up if a heavy sea should come on. Two of the three tugs returned immediately to Boston, where they arrived about 4 that afternoon (April 30th). The other tug, the Confidence, stayed by, and on the high tide that night moved the barque inside the north breakwater of Scituate harbor, where she again grounded. Her position was, however, greatly improved by this change, because she was protected against northerly and northeasterly storms. Thereafter she was reasonably safe. This completed the first stage of the salvage operations, which consisted in taking the barque from her position on Cox's Ledge to the position inside the breakwater. It was essentially a towing operation, not involving the use of wrecking apparatus or any special appliances, and not specially endangering the tugs engaged in it, the value of which was about $150,000.

The T. A. Scott Company was employed by the owners of the Professor Koch to patch her and pump her out, so that she could be towed to Boston, and at once proceeded to do so. No great or unusual difficulties were encountered, and on May 4th the repairs were sufficiently advanced to warrant attempting to take her to Boston. The Towboat Company was notified and sent down three tugs. With their assistance and that of the Confidence the barque was floated on the second attempt, and was towed to Boston. The night when she was taken out was very dark, and part of the work had to be done during a thunderstorm; but in other respects there were no unusual dangers or difficulties. The various tugs of the libelant Towboat Company were em-

ployed on the entire work, and in going to and from it, a little over 200 hours. Their combined value was, according to the libelant, about $175,000. They were subjected to no unusual perils or hazards. The per diem value of their services at their customary rates would have amounted to about $2,300. Several hawsers were broken, the value of which does not appear.

At the time when the Towboat Company was notified over the telephone of the wreck, there were several other concerns in Boston which either had, or could have arranged for, tugs to go down to the wreck. Whether any of them could have got tugs there in time to have pulled the barque off on the first high tide (as was done) is not certain. It was an important step in the salvage, for it is by no means impossible that, if the barque had lain on the rock over another high tide, she might have so filled that she could not have been pulled off, or would not have floated if she got clear, and her cargo was of such sort as to deteriorate rapidly after being wet.

The promptness with which the service was rendered by the libelant is, however, much diminished in importance by the fact that the revenue cutter Rogday, which was notified of the wreck, got to it long enough before high water to have pulled the barque off on that tide if the tugs had not done so. In fact the cutter was sending a small boat with a running line to the wreck when the tugs pulled her clear. The revenue cutter was by no means so well able to handle the barque after she got off the rock as were the tugs; and her master had no such knowledge of the coast as did Capt. Nickerson and Capt. Barry, and probably had not as good judgment as to what should be done. Nevertheless it seems reasonably certain that if the tugs had not been there the revenue cutter would have got the barque off, and would have placed her somewhere where her situation would have been greatly improved. There was nothing to prevent the cutter from putting the barque at the entrance to Scituate harbor, as was done, and sending for tugs to move her inside the breakwater on the next tide. That it would have been safe to attempt to bring the barque to Boston as soon as she came off the rock, I do not believe. The value of the barque in her damaged condition was $117,000; that of the cargo, $713,000.

The principles on which the award is to be made are well established. Most of the elements which lead to large awards are conspicuously absent in this case. The libelant did not discover the wreck; it was notified over the telephone, and took the matter up in a business way. Neither its tugs nor the men on them were subjected to any extraordinary hazards. After the barque had been placed inside the breakwater, where the Scott Company could work on her and repair her, the libelant's services contributed nothing further to her safety, and were no more than could have been obtained on commercial terms from other towing companies. The Confidence did little in the way of salvage work during the four days that she waited around Scituate harbor while the Scott Company was repairing the Professor Koch. She was there principally to hold a salvage claim for her owners and to forestall any suggestion that they had abandoned the salvage operations before completion. Obviously the barque and her cargo

should not be called upon to pay for that service. The element of uncertainty as to payment practically disappeared after the barque was landed inside the breakwater.

Concisely stated, what the libelant did on April 30th was to receive word over the telephone that the barque needed assistance, to dispatch tugs promptly to the place of accident, to pull the barque off at the next high water and ground her at the entrance of a nearby harbor, and on the next tide to move her inside the breakwater; all this work being done in moderate weather and within 15 miles of its home port. What it did on May 4–5 was to free the barque from her position behind the breakwater and tow her to Boston. The case is very different from that of a vessel deviating from her voyage to render assistance, or struggling with a wreck in a stormy sea at risk of life. The Annie Lord (D. C.) 251 Fed. 157. The most meritorious feature of the libelant's services, as I view them, is the good judgment and skill in handling and navigating the tugs and the wreck which was displayed by Capt. Nickerson (the libelant's manager) and his assistants. Their work seems to have been done exactly right from start to finish. But the libelants are not entitled to any such enormous toll out of the barque and her cargo as their libel claims. They are entitled to the market value of their services, plus a fair reward for the risk, which was little, for the promptness, which was excellent, but not exclusive, for the skill displayed, and for the success which resulted. The predominant consideration, as it seems to me, in awards for salvage service, where the property has not been abandoned, is that they should be sufficient to obtain again, if circumstances should repeat, the same, or adequate, service. The Samuel B. Hubbard (D. C.) 229 Fed. 843.

Applying these principles, I think that $10,000, which is more than four times the commercial value of the libelant's work, and many times that of its work in getting the barque from the rock where she stranded into Scituate harbor, is adequate, and is in harmony with awards in similar cases. The Tordenskjold, 255 Fed. 672, —— C. C. A. ——; The Devonian, 150 Fed. 831; The Jason (D. C.) 257 Fed. 438; The Teresa Accama (D. C.) 254 Fed. 637; The St. Charles (D. C.) 254 Fed. 509; The Lucia (D. C.) 222 Fed. 1015; The Western Star (D. C.) 157 Fed. 489; The Carroll (C. C. A. 4th) 167 Fed. 112 at the bottom of page 113, 92 C. C. A. 564.

For the reasons stated orally at the conclusion of the argument, the intervener Barry is awarded $250.

Decree accordingly.